## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

JOHN REDD,                      )

                         )

            Plaintiff,      )

                         )

     vs.                  )        No. 4:20-cv-000880-MTS

                         )

KILOLO KIJAKAZI, *acting commissioner*  )

*of the Social Security Administration*,   )

                         )

         Defendant.    )

### MEMORANDUM AND ORDER

      This matter is before the Court for review of the final decision of Defendant, the acting Commissioner of Social Security, denying the application of John Redd ("Plaintiff") for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. (the "Act").

## I.    Procedural History

      On August 11, 2016, Plaintiff filed an application for disability insurance benefits under the Act with an alleged onset date of May 19, 2015.  (Tr. 80, 261–62, 279).  After Plaintiff's application was denied on initial consideration, he requested a hearing from an Administrative Law Judge ("ALJ").  (Tr. 10, 197–200, 201–202).  Plaintiff and his counsel appeared for an in-person hearing before the ALJ on March 20, 2018.  (Tr. 100–43).  In a decision dated August 17, 2018, the ALJ concluded Plaintiff was not disabled under the Act.  (Tr. 7–25).  The Appeals Council denied Plaintiff's request for review on May 12, 2020.  (Tr. 1–7).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.[1]

---

[1] Section 1383(c)(3) of Title 42 provides for judicial review of the SSA Commissioner's "final decision."

II.        **Evidence Before The ALJ**

A.        **Overview and Function Report**

Plaintiff was born in 1970, and he alleged he became disabled beginning May 19, 2015, at age 45, due to lower back issues, leg nerve damage, diabetes, arthritis in his knee, neuropathy in his feet, and memory loss.  (Tr. 279).  Plaintiff has a college education and past work as an instructor in the U.S. Army, a corrections officer, a jailer for a sheriff, a small product assembler, and a house parent.  (Tr. 288–98).

In an August 2016 Function Report, (Tr. 299–313), Plaintiff indicated his medical conditions affected lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, and using his hands.  Additionally, these conditions kept him from being active, cutting firewood, handling water, washing dishes, woodworking, mowing the lawn, cooking, sitting too long, standing too long, walking too far, and driving long distances.  He wore a brace for his knee and used a cane and a hearing aid.  Plaintiff indicated his medical conditions also affected memory, completing tasks, concentration, understanding, and getting along with others.  He could pay attention for about 10 minutes; he did not do well with spoken instructions because he gets lost and frustrated.  Plaintiff indicated he did not handle stress well and that he would get frustrated and angry. Plaintiff stated he could not stop seeing things from his military experiences, PTSD; had bad dreams; did not want to do anything or go anywhere; could not remember things; and could not be around large crowds.

Plaintiff indicated he was in a lot of pain; sometimes he cried from the pain in his back and legs.  He also had to walk on the side of his foot, which caused knee pain, hip pain, and back pain. The pain also interfered with his sleep because he would wake up in the middle of the night in pain and needed to move around.  Plaintiff indicated his medications had many side effects, especially

2

making him sleepy.  Plaintiff stated there was not much he could do; he used to be active and now could do nothing.   Plaintiff indicated his day consisted of sitting watching TV; taking a nap or lying in the bed, because it helps with his back-pain; walking to the living room; sitting; letting the dogs out; taking a nap; making dinner; watching TV; and going to bed.

Plaintiff indicated his basic living is poor.  Regarding dressing, Plaintiff had to take his time; as to bathing, he endorsed difficulty washing his hair and his wife had to check the water to make sure it is not too hot;, he endorsed difficulty wiping after using the toilet.  Plaintiff reported his wife had to remind him to take medications, as well as help with his medications so he did not take too much; when his wife worked late, Plaintiff had to have medications all in a row with notes. Plaintiff could feed himself but did not cook and only heated up leftovers.  Plaintiff indicated he could drive a car, but his wife did most of the driving.  His wife also did the shopping, indicating he could not do it for long or very much.  If he did walk, Plaintiff used a cane or a cart while in a store.

### B.    Medical Evidence

The relevant time period for consideration of Plaintiff's claim is from May 19, 2015, the alleged onset date, until December 31, 2016, the date his insured status expired.  This point is not contested.

### 1.  **Left Knee**

Plaintiff's knee pain began after a fall in July 2014.  A February 2015 x-ray of the left knee was considered unremarkable. (Tr. 409–10).  In May 2015, Plaintiff was diagnosed with iliotibial band tendonitis.  (Tr. 490).  That month, Plaintiff reported pain had not resolved with conservative care; he had tried therapy, including a steroid injection, and taking anti-inflammatories, but his doctor had taken him off the anti-inflammatories secondary to esophageal stricture.  (Tr. 706).

Plaintiff noted pain limits him from doing a lot of things, and he wears a brace, which helps quite a bit, but he reports it catching.  During the exam Plaintiff reported pain and showed tenderness along the IT band insertion and LCL.  The provider noted his ligaments were very stable, and that Plaintiff showed no joint line tenderness, no medical pain with palpation, and no acute distress.  A previous MRI was reviewed, and the clinician indicated possible degenerative medial meniscus but no acute findings. (Tr. 707).  The provider recommended aggressive physical therapy and did not recommend an arthroscopy due to benign MRI findings.  In October 2015, the MRI was again reviewed; no tears noted or any other concerns for the causes of Plaintiff's pain.  (Tr. 661–63).  The provider recommended to continue conservative care and ordered physical therapy for left knee pain and strengthening.  (Tr. 471).

A February 2016 x-ray of the left knee was considered unremarkable. (Tr. 402).  That month, Plaintiff visited orthopedics with complaints of constant knee pain—worse pain with sitting or standing for long periods of time—and pops in the knees, described as painful.  (Tr. 634).  Plaintiff said his knee brace helped, but he occasionally did not wear it as he knew it can weaken his muscles.  He reported tenderness, hypersensitivity, and pain with range of motion.  (Tr. 635).  On physical exam, it was noted Plaintiff's left knee had no effusion, erythema, or warmth, and his range of motion was at 0 to 120, stable to varus and valgus stress.  The assessment was left chronic knee pain per arthroscopy, some chondromalacia.  The provider recommended Plaintiff continue with the knee brace and physical therapy and told Plaintiff he would have to live with some chronic pain because he was ineligible for a total knee arthroscopic arthroplasty due to his age.

In September 2016, Plaintiff reported left knee arthritis with pain and wore a brace and walked with a cane. (Tr. 1327).  In November 2016, Plaintiff reported ongoing knee pain, and x-rays were to be ordered; he was to call orthopedics if symptoms worsened.  (Tr. 1290).

2. **Diabetes with Neuropathy and Neuroma of the Right Foot**

Doctors diagnosed Plaintiff with diabetes mellitus with neuropathy and neuroma of the right foot. (Tr. 613, 620). Plaintiff reported his painful neuroma of the right foot began in 2011. (Tr. 1272). A January 2016 x-ray of the right foot was considered "unremarkable." (Tr. 649, 403). In April 2016, Plaintiff's chief complaints were of myoclonus, headache, and neuropathy. (Tr. 620). He reported a lot of jumping in his legs, particularly at night, which interfered with his ability to fall asleep. Plaintiff also endorsed upper extremity jerking multiple times of the day, right greater than left. (Tr. 621). An assessment noted diabetes, with painful ambulation, secondary to a foot neuroma. (Tr. 620). Plaintiff's foot had not responded to corrective inserts, shoe changes, or cortisone injections. (Tr. 1272). Plaintiff was seen in prosthetics and prescribed shoe/boots secondary to his type II diabetes mellitus with diabetic neuropathy. (Tr. 463).

At a May 2016 follow-up examination related to his diabetes, Plaintiff reported a small eruption on his right forearm and no other new problems. (Tr. 614). Plaintiff's objective physical status was "unremarkable," despite a very high hemoglobin A1C level, indicative of non-compliance with his prescribed diet. (Tr. 615).

In August 2016, Plaintiff presented with a hemoglobin A1C of 9.1 and he complained of muscle jerks, which a provider stated could be related to uncontrolled diabetes. (Tr. 578). He complained of jerking motions on bilateral sides, primarily at night; they involved the hands, arms, legs, and feet and may have awoken him at night. (Tr. 575). In September 2016, Plaintiff reported symptoms of neuropathy with numbness, burning, and tingling in his feet and legs and that it had been getting worse. (Tr. 1327). Plaintiff indicated if he was on his feet too long or sat down too long, he felt this neuropathy. The provider recommended dietary changes, exercise, and maintaining his glucose, blood sugar, and A1C at appropriate levels. (Tr. 1329).

In December 2016, Plaintiff's reported an HbA1c of 8.7, which was down from 9.1, but still at a high-level attributed to missing doses of medication. (Tr. 1284). The assessment at that time was Plaintiff was clinically doing fine but having foot pain. (Tr. 1285). The provider noted Plaintiff's diagnoses of uncontrolled type II diabetes mellitus, complicated by DKD on ACEI; obesity; hyperlipidemia; and chronic pain. (Tr. 1285). That same month, Plaintiff underwent surgical excision of the neuroma on the right foot. (Tr. 1188, 1333–37, 1235–1240). Treatment notes indicate Plaintiff tolerated the procedure well, with no complications.

### 3. **Headaches**

In July 2015, a brain MRI showed abnormalities. (Tr. 406). Later that year, Plaintiff reported headaches at times for several days. (Tr. 665). In December 2015, Plaintiff reported worsening chronic headaches, occurring three times per week. (Tr. 474, 652–655). He reported the headaches could last anywhere from one hour to two to three days, with pain described as throbbing, sometime sharp. He described two types of headaches, one more severe than the other, occurring one to two times per week. Plaintiff reported the more severe headaches began with seeing stars 20 minutes to one hour before beginning, and the headache was often associated with nausea, causing him to lay down. He reported improvement when lying down in a dark room. Plaintiff's symptoms pointed against tension and cluster headaches. (Tr. 477). Plaintiff received a bilateral occipital nerve block in the clinic that day. (Tr. 656).

In February 2016, Plaintiff endorsed a headache, noting the headaches were worse in the daytime when fighting severe sleepiness, secondary to the obstructive sleep apnea. (Tr. 637). Plaintiff noted the previous nerve block helped for two days but he did not like the way it made him feel. The diagnoses offered at that time was migrainous headaches, with occipital neuralgia,

and incomplete treatment for obstructive sleep apnea. (Tr. 639).  Imitrex was prescribed for severe headaches.

In April 2016, Plaintiff visited the hospital for a headache but indicated his headaches were doing much better; he only had two bad ones since the last visit.  (Tr. 620–21).  Plaintiff indicated Imitrex breaks them for him.  The impression on this visit reflected his headaches were doing okay with some reported mild clonus. (Tr. 623).

In June 2016, Plaintiff reported his headaches and overall pain worsened, but Imitrex helped sometimes.  (Tr. 598).  He described his headaches as dull to severe pain, lasting throughout the day; made worse with moving the head or laying on the back; with associated neck stiffness and spasms; occasional squiggly lines in vision; occasional nausea; and no light or sound sensitivity.  Plaintiff declined an occipital nerve block and was going to try a different medication instead.  It was noted Plaintiff had occipital neuralgia with cervicogenic and migrainous features. An MRI of the C-spine was ordered to see if the cervicogenic nature of the headache could be secondary along with the sensory level and myoclonic jerks' history.  (Tr. 600, 398).  The cervical MRI and x-ray demonstrated no soft tissue swelling and minimal multilevel degenerative disc disease.  (Tr. 399–400).

In August 2016, Plaintiff described his headaches as bilateral, radiating to the temples and frontal forehead, and occurring four days a week while lasting for hours.  (Tr. 575–78).  His worse headaches occurred two times per month.  Prior to the start of a headache, Plaintiff noticed twinkling in his vision.  The headaches were assessed as multifactorial with migraine type and cervicogenic, as well as medication overuse headache and from obstructive sleep apnea. (Tr. 578). Plaintiff switched to Naproxen.

4. **Dysphagia**

Plaintiff was diagnosed with dysphagia, (Tr. 493, 583, 610, 632, 672), likely attributed to a weakened esophagus from his diabetes. (Tr. 633, 612). A medical procedure in 2015 showed Plaintiff had a "normal esophagus" as well as normal biopsies. (Tr. 672, 351, 1397, 1400). In 2015, Plaintiff reported dysphagia for around three years and endorsed difficulty swallowing solids, liquids, and pills, as well as food materials getting stuck in his mid-esophagus. (Tr. 672). Plaintiff reported the impairment sometimes causes him difficulty swallowing 50-percent of the time. (Tr. 354, 1395). In May 2016, Plaintiff reported his dysphagia was two to three times per week and mainly limited to solids but also sometimes pills. (Tr. 610). He also reported food still got stuck in his chest, and he may get chest pain; and at times, it happened with liquids also. In July 2016, Plaintiff reported dysphagia to both liquids and solids. (Tr. 582–85).

5. **PTSD, Depression, and Anxiety**

Plaintiff was diagnosed with PTSD. (Tr. 812). He reported flashbacks and nightmares—about traumatic experiences in the military—beginning in October 2011 after his primary care doctor asked if he experienced any trauma. (Tr. 1314). The provider noted that one month before his symptoms began, Plaintiff was laid off due to budget cuts. (Tr. 1315). Plaintiff explained he had put these memories on the "back burner" since his discharge in 1998 because he had to go on with his life. Plaintiff reported nightmares every night since October 2011.

From May to December 2015, several mental status evaluations were "unremarkable" and "normal." (Tr. Tr. 670, 678, 659–660, 657). During this time, providers assessed Plaintiff's PTSD symptoms as "moderate to marked," (Tr. 657, 651), and sometimes that these symptoms interfered with normal psychosocial functioning. (Tr. 678, 671). Plaintiff described his mood as stressed, concerned, and frustrated. He reported stress associated with family issues, finances, and VA

benefits claim.  (Tr. 657, 650, 659).  Providers reported his affect was mood-congruent, with no evidence of thought disorder.  (Tr. 650, 660).  In December 2015, Plaintiff exhibited signs of major depressive disorder.  (Tr. 477).

In January and February 2016, Plaintiff received diagnoses of generalized anxiety disorder and of major depressive disorder.  (Tr. 643, 630).  During that time, providers noted Plaintiff's PTSD symptoms interfered with normal psychosocial functioning, noted he was mood-congruent, with no evidence of thought disorder or suicidal or homicidal ideations.  (Tr. 647, 630).  Plaintiff denied being depressed and endorsed issues with his family causing anxiousness; a frustrated and concerned mood; and nightmares and flashbacks relating to his traumatic experience in the military.  (Tr. 646, 629, 642).  Plaintiff reported medication decreased the nightmares, and since a change in his family situation, his nightmares became less vivid.

In April 2016, Plaintiff reported the loss of his father-in-law triggering traumatic memories.  (Tr. 624).  Plaintiff identified a sad and frustrated mood but was also somewhat relieved, depending on the topic.  A provider reported his affect was mood-congruent, with no evidence of thought disorder or suicidal or homicidal ideations.  Severity of symptoms were rated as moderate to marked, and his mental status evaluated as "unremarkable."  (Tr. 625).

In June and July 2016, Plaintiff endorsed depression, anxiety, negative thoughts, and nightmares and flashbacks regarding his military experience.  (Tr. 594, 586).  He discussed stressors such as traveling with his wife and the recent loss of his father-in-law.  Plaintiff stated he avoided crowds, loud noises, and news about people dying from accidents and swimming.  (Tr. 587).  Plaintiff indicated he would like to do more activities with his spouse, but pain limited him.  (Tr. 594).

9

In October 2016, Plaintiff reported experiencing many stressors at the VA, as it had dropped his service connection for his injuries, but he was appealing.  (Tr. 1314).  Plaintiff indicated he had increased nightmares about the war in Iraq and Afghanistan, the election, and other stressors.  He denied being depressed but was more anxious about the stressors.  (Tr. 1315).  The provider noted mood disorder, major depression, generalized anxiety disorder, and PTSD.  In November 2016, Plaintiff reported depression and frustration with the system and discussed experiencing stress regarding benefits at the VA.  (Tr. 1294).  In December 2016, Plaintiff showed depression, anger, grief, and loss.  (Tr. 1223).  He was unhappy at the VA for dropping his disability, angry about surgery, and upset about seeing his dog struck by a vehicle and killed.

## C.    Opinion Evidence

### 1.  **Dr. Stephen Scher**

In September 2016, Dr. Stephen Scher, a non-examining state agency physician, reviewed Plaintiff's medical records.  (Tr. 169–70, 174–76, 178).  In his opinion, he discussed Plaintiff's daily living such as needing reminders; inability to be in crowds; bad dreams; inability to handle stress or changes in routines; difficulty following spoken instructions; and Plaintiff's ability to drive, go out alone, and handle money.  Dr. Scher found Plaintiff's reported functional limitations partially inconsistent with the total evidence in the file.  For example, Plaintiff stated he could only pay attention for 10 minutes, however, multiple mental status evaluations noted concentration to be at least fair.

Dr. Scher found Plaintiff suffered from impairments of affective disorders and anxiety related disorders that caused mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, and pace.  Specifically, that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions;

maintain attention and concentration for extended periods; and interact with the general public. Dr. Scher also found Plaintiff was not significantly limited in his ability to remember locations, work-like procedures, and very short and simple instructions.  In conclusion, Dr. Scher opined that Plaintiff could remember and perform short and simple instructions, make simple work-related decisions, adapt to most changes in the workplace, and could work with others but would do best with limited public contact.

   2.   **Dr. Susan Rosamond**

   In September 2016, Dr. Susan Rosamond, a non-examining state agency physician, reviewed the medical records and opined that Plaintiff could perform a range of light work.  (Tr. 172–74).  She found Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, sit for six hours, and stand and walk for six hours.  He could frequently balance, kneel, crouch, and climb ramps and stairs, and occasionally stoop, crawl, and climb ladders, ropes, and scaffolds.  Dr. Rosamond found Plaintiff had no manipulative, visual, or communicative deficits.  However, she opined that Plaintiff had some environmental limitations, such that he must avoid concentrated exposure to temperature extremes, vibration, and hazards including machinery and heights.

   3.   **Third-Party Statement by Plaintiff's Wife**

   In August 2016, Lisa Redd, Plaintiff's wife, submitted a third-party function report.  (Tr. 314–20).  Mrs. Redd indicated her husband is not able to do much of anything; he would lie down a lot, because of back and knee pain; when he was up, he watched TV, which was his only hobby. She stated Plaintiff was not able to stand for long periods and had a hard time walking because of his back, knee, and neuropathy in the feet.  Mrs. Redd estimated Plaintiff could only walk for about 10 to 15 minutes and after a few minutes could resume.  Mrs. Redd reported Plaintiff did not feel comfortable doing things.  She stated Plaintiff would sometimes fold clothes and sweep, but Mrs.

Redd did the rest, including the yard work, grocery shopping, and preparing meals.  While Plaintiff would let the dogs in and out, Mrs. Redd feeds and bathes the dogs.  She stated Plaintiff took more time with dressing, showering, shaving, and going to the bathroom.  Mrs. Redd indicated Plaintiff had a hard time with driving, secondary to not having much feeling in his feet, and while he had no problem feeding himself, Plaintiff sometimes dropped plates of food because he lost feeling in his hand.  Mrs. Redd stated Plaintiff needed to be reminded about his doctor appointments, she constantly reminded him to take medication, and she sometimes reminded him to shower and get haircuts.  Mrs. Redd indicated Plaintiff's attention span was short and that he had never been good with instructions, sometimes requiring the same explanation several times.  She reported Plaintiff took so much medication that affected him to the point of no energy.

**D.   Hearing Testimony**

Plaintiff appeared and testified before the ALJ on March 20, 2018.  (Tr. 101–43).  Plaintiff, through his representative, noted he suffered from PTSD, diabetes, significant back problems, migraine headaches, some degree of paralysis in the nerves, and had been described as having neuropathy in the upper and lower extremities, with numbing and tingling of his hands and legs.  Plaintiff stated the combination of his impairments rendered him incapable of engaging in even unskilled sedentary work.

When asked about his migraine headaches, Plaintiff indicated he had frequent headaches two to three times per week, with it starting in his neck, and averaged around an hour causing him to need to lay down and close his eyes.  He had seen a neurologist, who did an MRI and told him he had unhappy blood vessels in his brain, but there was nothing serious and it was common for headaches.  Plaintiff indicated he took Naproxen for his head pain.

Plaintiff estimated he could only sit for one-hour tops, secondary to his legs going numb, tight back, and knotting of the muscles.  Plaintiff testified he was able to walk 20 to 30 feet and then stop and take a break for a couple of seconds and try to stretch his back out.  Plaintiff indicated he used a cane, prescribed by a doctor, to help with stability, so he keeps from falling.  Plaintiff testified to difficulty bending over and reaching items high up.  Plaintiff also indicated some degree of problems with his hands, which he reported is part of the neuropathy, and experiences numbness daily.  Plaintiff indicated he had problems with buttons, zippers, and coins, as well as issues with larger items, such as glasses and plates; he sometimes dropped them.

When questioned about frequent flashbacks relating to his military service, Plaintiff indicated they could hit him whether he was watching television or heard running of water.  He reports flashbacks happened daily, with episodes lasting a couple of seconds.  These episodes caused him to feel drained and withdrawn, typically requiring him to stop what he is doing and sit or lay down.  He reported these frequent flashbacks restricted him from dealing with people face-to-face. With regards to depression, Plaintiff indicated he had become suicidal, his dog had stopped him from a suicide attempt, and he subsequently went to the hospital for secondary treatment.

Plaintiff further testified to difficulty following instructions and remembering part of the instructions given.  Plaintiff indicated he did not work well with others.  He reported daily episodes of yelling at people, including violent outbursts without provocation, as well as getting upset at everyday things.  Plaintiff reported poor hygiene; his wife had to remind him every day to shower, put on deodorant, and change clothes.

## III.      Standard of Review and Legal Framework

To be eligible for disability benefits, Plaintiff must prove that he is disabled under the Act. *Baker v. Sec'y of Health & Hum. Servs.*, 955 F.2d 552, 555 (8th Cir. 1992).  The Act defines a

disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work" but also unable to "engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* at § 423(d)(2)(A).

The Social Security Administration has established a five-step sequential process for determining whether a person is disabled.  20 C.F.R. § 416.920(a)(4) (explaining the five-step sequential evaluation process).  Steps 1–3 require the claimant to prove: (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; and (3) his disability meets or equals a listed impairment.  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); 20 C.F.R. §§ 416.920(a)-(d), 404.1522.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to Steps 4 and 5.  *Pate-Fires*, 564 F.3d at 942; *see also* 20 C.F.R. § 416.920(e).  At this point, the ALJ assesses the claimant's residual functioning capacity ("RFC"), "which is the most a claimant can do despite her limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009); *see also* 20 C.F.R. §§ 416.920(e), 404.1545.  At Step 4, the ALJ must determine whether the claimant can return to his past relevant work.  20 C.F.R. § 416.920(f).  If the ALJ finds at Step 4 that a claimant cannot return to past relevant work, the burden shifts to the Administration at Step 5 to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.* §§ 416.920(g), 912, 960(c).

The court's role on judicial review is to decide whether the ALJ's determination is supported by "substantial evidence" on the record as a whole.  *Wagner v. Astrue*, 499 F.3d 842,

848 (8th Cir. 2007); *see also Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Even if substantial evidence would have supported an opposite decision or the reviewing court might have reached a different conclusion had it been the finder of fact, the Court must affirm the Commissioner's decision if the record contains substantial evidence to support it. *See McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome"); *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992) (explaining a court may not reverse merely because substantial evidence would have supported an opposite decision). The Eighth Circuit has emphasized repeatedly that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010) (quoting *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision," *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998), and not merely a "rubber stamp," *Cooper v. Sullivan*, 919 F.2d 1317, 1320 (8th Cir. 1990).

## IV.    **The ALJ's Decision**

The ALJ's decision in this matter conforms to the five-step sequential process outlined above. At Step 1, the ALJ found Plaintiff did not perform substantial gainful activity ("SGA")

since May 19, 2015, the alleged onset date.  (Tr. 83).  At Step 2, the ALJ found Plaintiff had severe impairments of diabetes mellitus with neuropathy and right foot neuroma, major depressive disorder, generalized anxiety disorder, and PTSD.  (Tr. 83–84).  At Step 3, however, the ALJ found Plaintiff did *not* have an impairment or combination of impairments that met or medically equaled a statutorily recognized impairment.  (Tr. 84–86).  The ALJ determined Plaintiff retained the RFC to perform a reduced range of simple, sedentary work with postural, environmental, and social limitations.  (Tr. 86).  He required a cane and needed an option to stand every hour for two minutes before returning to a seated position.  Plaintiff could occasionally balance, stoop, kneel, crouch, crawl, as well as climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  He could occasionally operate foot controls and frequently grasp and handle.  He must avoid exposure to heights, unprotected moving mechanical parts, and concentrated exposure to temperature extremes and vibrations.  He could perform simple instructions, make simple work-related decisions, and occasionally interact with supervisors, co-workers, and the public.  At Step 4, the ALJ found Plaintiff unable to perform any past relevant work.  (Tr. 94).  At Step 5, the ALJ considered Plaintiff's age, education, work experience, and RFC, and found there were jobs in the national economy that Plaintiff can work, such as an addressing clerk, a table worker, and a document preparer.  (Tr. 96).  Therefore, the ALJ concluded that Plaintiff is not disabled.

## V.   <u>Discussion</u>

Three specific issues exist between the parties in this case: (1) whether the ALJ erred at Step 2 by not considering certain medical impairments "severe" impairments, (2) whether the ALJ properly discounted Plaintiff's subjective complaints, and (3) whether the RFC is supported by substantial evidence.

A.  **The ALJ Properly Found Plaintiff's Impairments Non-Severe**

Plaintiff argues that the ALJ erred at Step 2 of the sequential analysis by not finding his left knee degenerative joint disease, migraines, and dysphagia to be severe impairments.  A severe impairment is an impairment that significantly limits a claimant's ability to perform basic work activities without regard to age, education, or work experience.  *See* 20 C.F.R. §§ 404.1522, 404.1520(c).  Basic work activities are "abilities and aptitudes necessary to do most jobs," including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling.  *Id.* § 404.1522(b).  The ALJ finds impairments non-severe if the medical evidence establishes only a "slight abnormality" that would have "no more than a minimal effect on an individual's ability to work."  *Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007) ("An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."); *Nguyen v. Chater*, 75 F.3d 429, 431 (8th Cir. 1996) (explaining that no Step 2 impairment is found if it has "no more than a minimal effect on the claimant's ability to work").

1.  **Left Knee Degenerative Joint Disease**

The ALJ considered objective images of Plaintiff's left knee, which showed mostly "unremarkable" imaging and normal x-rays.  The ALJ also considered multiple observations from physicians that Plaintiff had stable knee ligaments, with no significant tears or areas of concern.  The ALJ noted that in physical examination, Plaintiff retained full strength and intact sensation and coordination.  Also, Plaintiff frequently exhibited normal muscle bulk and tone, 5/5 strength of the lower extremities with the ability to move all four extremities spontaneously, and no en bloc turning when using a cane.  Additionally, the ALJ noted that on physical exams, on some occasions, Plaintiff walked with an antalgic gait, used a cane, and showed myoclonic jerks,

tenderness, and relax deficits; and on other exams he walked with a normal gait and ambulated independently.  The ALJ noted Plaintiff relied on a knee brace that helped with movement and pain as well as a cane for stability.  Thus, the ALJ's determination that Plaintiff's knee impairment has no "more than a minimal effect" on his ability to work is supported by substantial evidence. *Nguyen*, 75 F.3d at 431.

### 2.  Dysphagia

Although Plaintiff was diagnosed with dysphagia, those physicians did not impose limitations that prohibited Plaintiff from performing "basic work activities."  To the contrary, Dr. Rosamond considered the impairment and found it non-severe.  The record also shows Plaintiff had a "normal esophagus" and normal biopsies.  (Tr. 672, 351, 1397, 1400).  Although Plaintiff reports this impairment sometimes caused him difficulty swallowing 50-percent of the time, Plaintiff has not suggested or pointed to any evidence showing what work-related limitations result from this impairment, such as how difficulty swallowing prevents him from performing work as an addressing clerk, table worker, or document preparer, and it is Plaintiff's burden to prove his impairment is severe.  *Nguyen*, 75 F.3d at 430; *see also Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001) (explaining that a claimant bears the burden of showing a severe impairment significantly limits her ability to perform basic work activities).  Thus, the ALJ properly found the impairment non-severe because the record does not show Plaintiff's dysphagia prohibits him from performing "basic work activities."  *See* 20 C.F.R. §§ 404.1522, 404.1520(c).

### 3.  Headaches/Migraines

The ALJ found Plaintiff's headaches non-severe because a neurologist opined that his headaches may be caused by medication overuse and subsequently changed Plaintiff's

medications.[2]   Conditions that are controllable or amenable to treatment or medication are not considered disabling.  *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) ("Impairments that are controllable or amenable to treatment do not support a finding of disability."); *Mabry v. Colvin*, 815 F.3d 386, 391–92 (8th Cir. 2016) (citing *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010)) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").  The ALJ also relied on Dr. Rosamond's opinion, who considered the headaches and found Plaintiff remained capable of work.

Besides his subjective complaints, Plaintiff submitted no evidence that his headaches "significantly" limit his work ability.  *See* 20 C.F.R. § 404.1522; *Nguyen*, 75 F.3d at 430.  As an example, Plaintiff reported his headaches were debilitating because they require him to lay down, but he provides no medical evidence of this requirement.  *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) (finding whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day).  While it is true during the relevant period medical records show Plaintiff self-reported his most severe headaches were often associated with nausea, causing him to lie down, records also show that he refused medical treatment that would alleviate this pain.[3] The ALJ properly considered this information when discounting Plaintiff's complaints of disabling

---

[2] Although Plaintiff testified at the hearing—15 months *after* the end date of the relevant period—that his headaches continued despite the medication change, such evidence does not undermine the ALJ's opinion.  *See Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) (noting for Title II purposes, the court need "only consider the applicant's medical condition as of his or her date last insured."); *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997) ("Additional evidence showing a deterioration in a claimant's condition significantly *after* the date of the [ALJ's] final decision is not a material basis for remand.").  And, Plaintiff puts forth no later evidence of a diagnoses related to his headaches during the relevant period, *ie*: the time *before* his insured status expired.  *See Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984).

[3] During the relevant period, evidence showed Plaintiff's headaches could also be attributed to his sleep apnea, but Plaintiff refused to use his CPAP machine despite being told that it could help his headaches.  (Tr. 637, 639, 1482). Plaintiff also underwent a nerve block, (Tr. 565), which provided temporary relief for his headaches, (Tr. 598), but later declined an additional one.  (Tr. 600).

19

headaches.  *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (a claimant's failure to seek treatment weighs against the reliability of his subjective complaints); *see also* 20 C.F.R. § 404.1529(c)(3)(v) (considering the claimant's treatment when evaluating her symptoms); *Chamberlain v. Shalala*, 47 F.3d 1489, 1495 (8th Cir.1995) (failing to seek aggressive medical care is not suggestive of disabling pain).  Although Plaintiff puts forth favorable evidence that his headaches are severe, the ALJ's finding of a non-severe impairment is also supported by substantial evidence.[4]  *See Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (explaining if the court finds that the evidence supports two inconsistent positions and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision); *Locher*, 968 F.2d at 727 (explaining a court may not reverse merely because substantial evidence would have supported an opposite decision).

B.  **The ALJ Properly Considered the Credibility of Plaintiff's Subjective Symptoms**

Next, Plaintiff argues the ALJ improperly discounted his subjective complaints, which the ALJ must consider when determining a claimant's RFC.  *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).   The ALJ cannot discount subjective complaints solely because they are unsupported by objective medical evidence.  *Halverson v. Astrue*, 600 F.3d 922, 931–32 (8th Cir. 2010) (citing *Mouser*, 545 F.3d at 638).   However, the ALJ may discount complaints if they are inconsistent with the evidence as a whole.   *Chaney v. Colvin*, 812 F.3d 672, 677–78 (8th Cir. 2016).  When analyzing a claimant's credibility, the ALJ considers various factors.[5]  *See* 20 C.F.R. § 404.1529; *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) (explaining the factors are (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating

---

[4] Plaintiff also argues the ALJ did not discuss his migraine headaches anywhere in the decision. Doc. [20] at 7. However, this argument lacks merit; the ALJ discussed Plaintiff's headaches several times in the decision.  (Tr. 88–89).

[5] The ALJ expressly lists these factors in the decision. *See* (Tr. 86).

and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) any functional restrictions); *see also Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) ("[L]ack of objective medical evidence is a factor an ALJ may consider."). The Court defers to the ALJ's credibility determination if it is supported by good reasons and substantial evidence. *Bryant v. Colvin*, 861 F.3d 779, 782–83 (8th Cir. 2017).

The ALJ provided various reasons for finding Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms inconsistent with the evidence in the record as a whole. The ALJ did not dispute that Plaintiff experienced symptoms but found those symptoms not to be as limiting as Plaintiff claimed based on (1) objective medical evidence, including clinical findings during his mental status and other examinations, (2) medical opinions, (3) aggravating factors, and (4) his daily activities. The Court finds that the ALJ properly discounted Plaintiff's subjective complaints based on objective medical evidence, aggravating factors, daily activities, inconsistencies between medical examinations and subjective complaints, and the opinions of the state agency consultants, all of which were more consistent with the medical evidence as a whole. *Chaney*, 812 F.3d at 677–78 (allowing the ALJ to discount complaints inconsistent with the evidence as a whole).

First, the ALJ looked at the objective medical evidence. The ALJ found Plaintiff's claims of disabling impairments inconsistent with the mostly "unremarkable" or "normal" objective mental status examinations and "unremarkable" physical exams during the period at issue. The ALJ properly relied on such evidence when discounting Plaintiff's subjective complaints. *Goff*, 421 F.3d at 792 (holding proper the ALJ's consideration of unremarkable or mild objective medical findings as one factor in assessing credibility of subjective complaints).

The ALJ also considered Plaintiff's longitudinal records.   While Plaintiff's mental symptoms waxed and waned between appointments, the ALJ noted he generally appeared alert, oriented, neatly groomed with normal speech, and logical and goal-directed thought process with normal remote memory.   The ALJ properly relied on these normal clinical findings when discounting Plaintiff's subjective complaints.  *See Adamczyk v. Saul*, 817 F. App'x 287, 291 (8th Cir. 2020) (discounting a claimant's subjective statements, in part, based on consistent medical reports noting well-groomed, clear speech, linear thought process, cognition and memory intact, and ability to follow and engage in appropriate conversation); *Halverson*, 600 F.3d at 933 (finding that appearing alert and oriented with normal speech and thought processes is inconsistent with claimant's allegations of disability).   Similarly, regarding his physical impairments, although walking with an antalgic gait was observed in several of Plaintiff's physical exams, providers generally noted normal physical and neurological motor examinations, with full strength and intact sensation and coordination.   Inconsistencies between Plaintiff's alleged extreme symptoms and his consistent normal clinical findings provide the ALJ a reasonable basis to discount his subjective statements.  *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (holding the ALJ may find a claimant's subjective pain complaints not credible in light of objective medical evidence to the contrary).   Thus, the Court defers to the ALJ's well-supported determination that Plaintiff's subjective complaints of complete disablement were not wholly credible based on objective medical evidence to the contrary.  *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (deferring to the ALJ's credibility determination where the objective medical evidence did not support the claimant's testimony as to the depth and severity of his physical impairments).

Moreover, the ALJ properly considered the nature of Plaintiff's treatment.  *See* 20 C.F.R. § 404.1529(c)(3)(v) (stating the agency will consider the claimant's treatment when evaluating his

symptoms).  The ALJ noted a pattern of conservative treatment, see *Moore*, 572 F.3d at 525 (upholding ALJ's analysis of finding, in part, that relief from conservative treatments were inconsistent with allegations of disabling symptoms), and his failure to pursue more aggressive treatment, see *Tate v. Apfel*, 167 F.3d 1191, 1197 (8th Cir. 1999), as reasons to discount the reliability of Plaintiff's debilitating complaints.  *See also Vanlue v. Astrue*, No. 4:11-cv-595-TIA, 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (finding minimal and conservative mental health treatment weigh against a finding of disability).  Also, notably, Plaintiff underwent a successful surgical excision of the neuroma on the right foot and the record shows no complaints thereafter.  *Walker v. Shalala*, 993 F.2d 630, 631–32 (8th Cir. 1993) (finding lack of ongoing treatment inconsistent with complaints of disabling condition); *Mabry*, 815 F.3d at 391–92.

Second, the ALJ looked at medical opinions assessing Plaintiff's physical and mental working capability, and Plaintiff does not contest the validity of those opinions.  Two state agency consultants opined that Plaintiff was not disabled and the ALJ properly relied on these medical opinions.  *See Masterson v. Barnhart*, 363 F.3d 731, 737–39 (8th Cir. 2004) (holding the ALJ properly relied on the assessments of a non-examining physicians in determining the claimant's physical RFC); *Kamann v. Colvin*, 721 F.3d 945, 951 (8th Cir. 2013) (finding a state agency psychologist's opinion supported ALJ's finding that claimant could work despite his mental impairments); 20 C.F.R. § 404.1513a (explaining evidence from Federal or State agency medical or psychological consultants must be considered because those doctors are "highly qualified and experts in Social Security disability evaluation"); *Id.* at § 404.1529(b)–(c) (evaluating symptoms with medical opinions).  No medical opinion provides a contrary conclusion of disablement and despite undergoing physical and mental therapy for his impairments, no treating physicians imposed greater limitations on Plaintiff than the ALJ.  *Tennant v. Apfel*, 224 F.3d 869, 871 (8th

Cir. 2000) (discrediting Plaintiff's subjective complaints based on absence of physician-ordered limitations and the lack of objective medical evidence is proper).

Next, the ALJ discussed aggravating factors.  The ALJ acknowledged that Plaintiff's PTSD derived from traumatic events while in the military; however, Plaintiff's PTSD treatment, as well as the depression and anxiety he experienced, focused on situational stressors, including financial problems, family and pet deaths, custody of his grandchildren, family conflicts, and frustration with the VA.  As such, the ALJ properly found that Plaintiff's mental health symptoms were generally tied to situational stressors, and therefore not completely disabling as alleged.  *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (finding mental impairment symptoms that are "situational in nature" not a basis for disability); *see also* 20 C.F.R. § 404.1509 (requiring impairment to last for a specific duration).  The ALJ further questioned Plaintiff's credibility regarding the severity of his symptoms based on his failure to follow treatment advice.  For example, despite alleging disabling diabetes, Plaintiff was non-compliant with his medications and dietary changes.  Non-compliance weighs against credibility.  *See Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016) (noting the "inability to follow a recommended course of treatment also weighs against [] credibility"); *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (noting that failing to follow a recommended course of treatment weighs against a claimant's credibility); *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001) (finding claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain).

Finally, the ALJ found that Plaintiff was more capable than he alleged based on his daily activities, notwithstanding his physical and mental ailments.[6]  Inconsistencies between Plaintiff's

---

[6] Plaintiff argues that the ALJ's cited daily activities are insufficient to prove his ability to work.  *See, e.g.*, *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) (explaining there are cases where a claimant's ability to engage in certain

24

subjective complaints and evidence regarding his activities of daily living may raise legitimate concerns about credibility. *Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001); *Vance v. Berryhill*, 860 F.3d 1114, 1121 (8th Cir. 2017); *Dunahoo*, 241 F.3d at 1033 (explaining evidence of the claimant's daily activities may be considered in judging the credibility of complaints of pain). The ALJ discussed Plaintiff's daily activities—such as driving, handling money, performing light household chores, performing personal care independently, heating up meals using the microwave, and using the computer to check emails. Although it is true that Plaintiff's daily activities demonstrate some limitations, the ALJ properly found that Plaintiff's ability to engage in the cited activities is inconsistent with allegations of debilitating symptoms precluding *all* work. *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) (explaining that even if a claimant can point to some evidence that detracts from the [ALJ's] determination, "good reasons and substantial evidence on the record as a whole support the [ALJ's] RFC determination").

### C.  __The RFC Is Supported By Substantial Evidence__

Finally, Plaintiff argues that the RFC is not supported by substantial evidence. The Eighth Circuit has noted that the ALJ must determine a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. *Goff*, 421 F.3d at 793. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley*, 829 F.3d at 932 (8th Cir. 2016) (citing *Cox*, 495 F.3d at 619). The ALJ considers all of a claimant's

---

personal activities does not constitute substantial evidence that he has the RFC to work). However, the ALJ cited Plaintiff's daily activities as evidence inconsistent with Plaintiff's subjective complaints—not as evidence that his daily activities demonstrated an ability to work.

impairments—severe and non-severe—in determining the claimant's RFC.  *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(2).

### 1. *RFC Physical Limitations*

The RFC reflects limitations from Plaintiff's non-severe[7] left knee impairment and severe physical impairments of diabetes mellitus with neuropathy and neuroma of the right foot. Regarding Plaintiff's knee, neuropathy, and right foot neuroma, the record indicates those impairments prevented him from standing, walking, or sitting for extended periods; with reported difficulty lifting, squatting, bending, reaching, kneeling, stair climbing, and doing anything active. To aid these functional limitations, Plaintiff uses a knee brace and a cane.  Consistent with that evidence, the ALJ limited Plaintiff to "sedentary work," which is defined in part, as a job where "walking and standing are required occasionally."  20 C.F.R. § 404.1567(a).  To account for Plaintiff's other functional limitations, the RFC also limited work to use of a cane, the option to stand every two hours for two minutes before returning to a seated position, and other postural limitations.  Notably, Plaintiff points to no medical evidence imposing greater work-related limitations than the RFC.  *Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014) (holding proper the ALJ considered the fact that no physician-imposed work restrictions during the time period relevant to Plaintiff's claim); *Goff*, 421 F.3d at 790 ("A disability claimant has the burden to establish her RFC").

---

[7] As the Court discussed *supra*, the ALJ found Plaintiff's headaches and dysphagia "non-severe" impairments. Nonetheless, the ALJ must still account for these impairments in the RFC.  20 C.F.R. § 404.1545(a)(2).  However, no medical evidence suggests these impairments cause any work-related limitations.  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (explaining an RFC must be supported by some medical evidence of the claimant's ability to function in the workplace); *Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014) (holding proper the ALJ considered the fact that no physician-imposed work restrictions during the time period relevant to Plaintiff's claim).  Rather, Plaintiff self-reported limitations, but, as discussed *supra*, the ALJ engaged in a proper credibility analysis and then "properly limited [the] RFC determination to only the impairments and limitations [the ALJ] found credible based on [] evaluation of the entire record."  *McGeorge v. Barnhart*, 321 F.3d 766, 769 (8th Cir. 2003); *see also Goff*, 421 F.3d at 793 (explaining the RFC is based on all "credible evidence").

Despite these limitations, the ALJ found Plaintiff able to engage in sedentary work based on consistent clinical findings that Plaintiff exhibited normal muscle bulk, tone, strength, and psychomotor activity; ability to move all four extremities spontaneously; no involuntary motion of the hands or head at rest; no en bloc turning when using a cane; and no evidence of neurological deficits.  The ALJ properly relied on this evidence.  *Hensley*, 829 F.3d at 934 (affirming RFC based on treating providers clinical findings of physical ability); *Flynn v. Astrue*, 513 F.3d 788, 793 (8th Cir. 2008) (same); *see also* 20 C.F.R. §§  404.1545(a)(3) (considering "descriptions and observations" of a claimant's limitations from an impairment in RFC assessment).  The ALJ also considered Dr. Rosamond's medical opinion of Plaintiff's physical working capability that opined he could perform a range of "light work" with some postural and environmental limitations.  Medical opinions are proper evidence the ALJ may use when determining a claimant's RFC.  *See* 20 C.F.R. §§  404.1545(a)(3) (considering evidence in RFC assessment); 404.1527 (evaluating opinion evidence), 404.1513a (evaluating evidence from Federal or State agency medical or psychological consultants).  The ALJ gave her opinion "partial" weight because Dr. Rosamond did not review all of the later records but did possess disability program knowledge and expertise.  The ALJ reached this conclusion in accordance with the Commissioner's regulations, 20 C.F.R. §§ 404.1513a and 404.1527(c), and the evidence of record.  Thus, the ALJ limited Plaintiff to sedentary work instead of light work as Dr. Rosamond opined.

As to Plaintiff's diabetes, the ALJ did acknowledge Plaintiff's high A1C levels at various times during the relevant period.  However, the ALJ noted the high levels were mostly due to noncompliance with prescribed treatments, such as medication and diet changes.  *Mabry*, 815 F.3d at 391–92 ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.");  *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) ("Failure to follow a prescribed

course of remedial treatment without good reason is grounds for denying an application for benefits."). Further, the ALJ found that Plaintiff's diabetes did not cause functional limitations, as evidenced by the numerous "unremarkable" objective status exams and the lack of medically necessary restrictions, restrictions on his daily activities, or functional limitations of record. *Brown v. Chater*, 87 F.3d 963, 964–65 (8th Cir. 1996) (finding lack of significant medical restrictions imposed by treating physicians supported the ALJ's decision of no disability).

### 2. *RFC Mental Limitations*

The RFC also reflects limitations from Plaintiff's mental impairments of PTSD, major depressive disorder, and generalized anxiety disorder. Based on record evidence, the ALJ found Plaintiff had moderate limitations in understanding, remembering, and applying information; interacting with others; and concentrating, persisting, or maintaining pace. Consistent with those findings, the ALJ limited Plaintiff to "simple" work with occasional social interaction and environmental limitations, such as no exposure to hazards and heights.

Despite Plaintiff's limitations, the ALJ found him able to work based on consistent clinical observations that Plaintiff exhibited logical thought process, fair fund of knowledge, adequate attention and concentration, intact memory, appropriate speech, and was alert and oriented. Moreover, providers generally reported Plaintiff's PTSD symptoms as "moderate" or "moderate to marked" severity without ever reporting, noting, or opining that his symptoms were disabling or caused work-related issues. *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (finding it significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work). And the RFC need only include the limitations supported by the record. *See Tindell v. Barnhart*, 444 F.3d 1002, 1007 (8th Cir. 2006).

28

The ALJ also gave Dr. Scher's opinion "great weight" reasoning the opinion was consistent with medical evidence as a whole.  20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."); *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) (finding ALJ did not err in considering a state agency psychologist's opinion along with the medical evidence as a whole). Dr. Scher opined that Plaintiff could perform short and simple instructions, make simple work-related decisions, and could work with others, but would do best with limited public contact.  Thus, the RFC permitting Plaintiff to perform simple instructions and make simple work-related decisions is supported by substantial evidence.

The ALJ also looked at Plaintiff's longitudinal records that showed no evidence of thought disorder or delusions and Plaintiff mostly denied suicidal ideations.  *Mabry*, 815 F.3d at 391 (finding no delusions, hallucinations, or suicidal ideations as medical evidence inconsistent with disablement).  The ALJ also noted the conservative nature of Plaintiff's medical treatment prior to the expiration of his insured status.  *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (noting an ALJ may consider a plaintiff's conservative course of treatment as indicative that his symptoms are not disabling); *Mabry*, 815 F.3d at 392 (finding lack of hospitalization weighs against severity of symptoms).  The ALJ did recognize that in 2017—*after* Plaintiff's last insured date—he was hospitalized for suicidal thoughts.[8]  Although the record may indicate Plaintiff's mental health worsened in subsequent years, such later evidence does not demonstrate disability during the period relevant to his claim.  *See Thomas v. Sullivan*, 928 F.2d 255, 260-261 (8th Cir. 1991) (explaining that a claimant's worsening condition, which deteriorated after the ALJ's decision, could not act as the basis of determining claimant's condition at the time he was eligible for

---

[8] The record also shows that Plaintiff's anxiety and depression may have worsened post-insured date.

benefits); *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) (noting for Title II purposes, the court need "only consider the applicant's medical condition as of his or her date last insured"). Thus, the ALJ properly found Plaintiff's medical treatment and symptoms prior to the expiration of his insured status did not support including greater limitations into the RFC finding.

The ALJ is not required to list and reject every possible limitation.  *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011).  In the instant case, the ALJ made clear which of Plaintiff's alleged physical and mental limitations were supported by the record and, which were not, and accounted for them in the RFC.  The findings in this case, as discussed above, demonstrate the ALJ's opinion is supported by substantial evidence.

CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 4th day of February 2022.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE